# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 26, 2013

## RICHARD TREHERN v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Hawkins County
### No. 11-CR-317    John F. Dugger, Jr., Judge

### No. E2012-01475-CCA-R3-PC - Filed September 27, 2013

Petitioner, Richard Trehern, appeals from the post-conviction court's denial of his petition for post-conviction relief following an evidentiary hearing. On appeal, Petitioner contends that the post-conviction court erred in denying the petition because trial counsel rendered ineffective assistance of counsel. More specifically, Petitioner contends that trial counsel was ineffective (1) by failing to adequately communicate and meet with him to prepare for the case; (2) by failing to attack the credibility of Petitioner's wife on cross-examination; (3) by failing to advise him that the crime for which he was charged had no release eligibility date; (4) by failing to adequately advise him of the consequences of *Momon*; and (5) by failing to obtain an expert witness to rebut the State's theory of shaken baby syndrome. Following our review of the record, we affirm the denial of relief.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Francis X. Santore, Jr., Greeneville, Tennessee, for the appellant, Richard Trehern.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Alex Pearson, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

The facts underlying Petitioner's conviction as recited by this court on direct appeal are as follows, and Petitioner is referred to as "the Defendant:"

The Defendant married Michelle Trehern in Alabama. The couple divorced in November 2006, and Trehern moved back to Tennessee. She gave birth to the victim on December 20, 2006. The couple attempted to reconcile. The Defendant moved to Tennessee and began living with Trehern on March 5, 2007.

Dr. Stanley Giles testified that he was the victim's pediatrician. He first saw the victim when she was six days old. He saw the victim again on April 2, 2007, and she had a fever of 101 degrees, a runny nose, a cough, diarrhea, and she was spitting up. The victim weighed fifteen pounds and four ounces. No injury or trauma was reported. He next saw the victim on April 11, 2007, for a fever of 103 degrees. The victim was sleeping a lot, was difficult to wake, did not want to eat, and seemed exhausted and inactive. The victim's mother reported that when she changed the victim's diaper, the victim shook her arms. The victim's mother had called a nurse at Wellmont Health Systems, and the nurse thought the victim might have experienced a seizure. There was no history of injury or trauma, and because the victim was losing weight, Dr. Giles made the diagnosis of "failure to thrive." He ordered a complete blood count, a basic metabolic panel, and thyroid testing, but other than a minimally elevated white blood cell count, the test results were normal. There was no evidence of a bleeding disorder, blood disorders, kidney disorder, or diabetes.

On cross-examination, Dr. Giles testified that the victim had weighed five pounds and fourteen ounces at her six-day visit. The victim's birth weight had been six pounds and five ounces, but Dr. Giles said that it was normal for a newborn infant to lose ten to twelve ounces after birth. Dr. Giles's partner, Dr. Fuller, examined the victim at seven weeks of age for a possible umbilical hernia, and the victim weighed eleven pounds and six and one-half ounces. Dr. Giles examined the victim at two months of age and detected a heart murmur, the umbilical hernia, and a bad diaper rash. He referred the victim to a cardiologist. He also referred her to physical therapy for congenital torticollis, which involved the victim's neck muscles being pulled from the left or right. He said the condition could occur from positioning in the crib or from

-2-

stretching the muscles during birth. Otherwise, the victim appeared to be active, responsive, and developing normally. He did not detect any bruising or evidence of trauma.

Dr. Christopher Arnold Landis testified that he was the emergency room physician at Wellmont in Hawkins County. He was not working on April 7, 2007, when the victim was seen in the emergency room, but he reviewed the records from that visit. The victim's mother had reported that the victim would not eat or sleep and had a runny nose and diarrhea. He said that no history of injury or trauma was noted. Dr. Landis saw the victim in the emergency room on April 18, 2007, and admitted her for possible seizure activity. The victim remained overnight for observation, but no seizure activity was recorded. There was no indication of trauma or injury. Dr. Landis also ordered a complete blood count and a chemistry panel, which were normal except for a slightly elevated white blood cell count. He also referred the victim to Dr. Christopher Calendine, a pediatrician, for observation. He said Dr. Calendine or Dr. Calendine's nurse practitioner had noted the victim had an ear infection. He said Dr. Calendine had conducted a urinalysis which indicated a possible urinary tract infection. He found no source for any seizures.

On cross-examination, Dr. Landis testified that he did not review the victim's emergency room records from April 7 at the time of the victim's April 18 visit. He was unaware until later that the victim had been seen in the emergency room on April 7. Dr. Landis explained that there was no predictor for when a seizure would occur. The victim's mother had described the victim's seizure as a generalized jerking and holding of the breath or not breathing. He did not observe any bruising or signs of abuse, and he said there was no recorded abuse. He said the victim looked like a baby who did not feel well, "just kind of sleepy, lying there in no apparent distress." The victim's pupils were normal.

Dr. Donald Sleeter testified that he was an emergency medicine physician at the Hawkins County Emergency Department. He saw the victim in the emergency room on April 21, 2007. He said the victim was reported to have experienced another seizure episode which lasted five to ten seconds. He believed the seizure was tonic, meaning that the victim's muscles flexed and then relaxed. He reviewed the victim's previous admission records and ordered a CT scan of the victim's head. He did not observe any physical signs of trauma or injury. The victim appeared to be awake and relatively healthy.

He said the victim had already been scheduled for a follow-up appointment with a neurologist. He said that Dr. Gash, a radiologist with NightHawk Services in Knoxville conducted the "wet read," or initial review of the victim's CT scan. The scan showed large collections of blood on both sides of the brain, one being 1.5 centimeters and the other was 5 millimeters. The scans showed areas of decreased density, meaning that the blood there was older, or chronic. Upon Dr. Calendine's recommendation, Dr. Sleeter transferred the victim to the pediatric intensive care unit at Johnson City Medical Center.

On cross-examination, Dr. Sleeter testified that the victim appeared active and alert. He said her pupils were equally reactive and normal. However, he did not perform a funduscopic examination of the victim's eyes. He said the CT scan did not show evidence of blunt trauma, but only the large subdural fluid collections. The victim's fontanels appeared normal.

Dr. Judson Gash testified that he was a radiologist with the Association of University Radiologists and the University of Tennessee. He said he read a chest x-ray of the victim conducted on April 18 and a head CT scan of the victim conducted on April 21. He said that the areas of linear hyperdensity, or brightness, on the CT scans represented blood. He said that the brighter the density, the more recent the bleeding. He said that an acute hemorrhage was one that had occurred within a few hours to a few days before the scan. Dr. Gash described three areas of abnormality. The first was an interspheric hemorrhage, which meant that it was between the hemispheres of the brain, and it was acute. The second area of abnormality was a low density or chronic subdural hematoma over the victim's right cerebral hemisphere. This area of old hemorrhage had pushed the brain away from the skull. The third area of abnormality was an intermediate collection of blood over the left frontal lobe. This area of hemorrhage could have been subacute, or several weeks old, or it could have been an old hemorrhage with a new hemorrhage in it. He said that the hematomas had different ages and that the most likely cause was non-accidental head injury, or shaken baby syndrome. He said that based upon his findings, the victim had suffered more than one injury.

On cross-examination, Dr. Gash testified that non-accidental trauma was a synonym for child abuse, battered child syndrome, and shaken baby syndrome. The same type of injury would not be unusual as a result of a motor vehicle accident. However, the pattern of acute and older hemorrhage and the interhemispheric hemorrhage in this case were highly specific and highly

-4-

suggestive indicators for non-accidental head injury, particularly when there was no evidence of external trauma. He agreed that "suggestive" did not mean "conclusive." He acknowledged that cerebral hemorrhage could occur as a result of birth and that a child's minor cerebral hemorrhage at birth could be exacerbated by a later trauma such as being dropped. However, placing a child in a "bouncy" seat or swing would be extraordinarily unlikely to create the acceleration and deceleration necessary to cause the type of injuries in this case. He said a fall would be very unlikely to create the pattern of injuries similar to the victim's.

Michelle Trehern testified that she had married the Defendant when she lived in Alabama and that they had two children. She was awarded full custody of the children upon the couple's divorce in November 2006. She moved back to Tennessee in October 2006, and the Defendant came to live with her on March 5, 2007. At first, her mother and her mother's neighbor babysat the victim while she worked. After the Defendant moved to Tennessee, he and some neighbors babysat the victim, although she could not remember the neighbors' names.

Ms. Trehern testified that the victim regressed in development. The victim had problems holding up her head, when she had been able to before, and the victim also stopped rolling over. It was difficult to keep the victim awake. She denied seeing the Defendant shake the victim, but when asked if the victim had been crying before she caught the Defendant shaking the victim, she responded that the victim had been crying for a few minutes. She said the Defendant had a bad temper and had to attend anger management classes for about a month. The Defendant called the victim a "b----" once or twice when he was very frustrated. She said the Defendant did not understand why the victim kept crying.

Ms. Trehern testified that she made a statement to Investigator Teddy Collingsworth and signed it. However, she denied making any corrections to the statement. She said that she initialed the corrections that Collingsworth made. She did not agree that she told Collingsworth that the Defendant was the only person who cared for the victim while she worked. She said she told Collingsworth and the Department of Children's Services (DCS) that neighbors also babysat the victim. She claimed that Collingsworth would not let her read the statement after he wrote it but that he read it aloud to her. She said that Collingsworth never read anything to her about the Defendant shaking the victim. She agreed that she told Collingsworth that she might

know what caused the injuries, but she denied that she meant that the cause was the Defendant's shaking the victim. She was unaware of any injury to the victim, and she never saw the child dropped. The Defendant later told her he had sneezed, blacked out, and dropped the victim. She agreed that she left with the Defendant after she gave her statement to Collingsworth, but she said she had nowhere else to go until DCS found her an opening in a shelter. She said her mother and father had custody of the victim.

On cross-examination, Ms. Trehern testified that no one had asked whether someone other than the Defendant had tended the victim until DCS questioned her at the Johnson City Medical Center. She said that after her meeting with Collingsworth, she asked the Defendant to tell her if he had done anything. She had testified during a May 17, 2008 hearing in juvenile court that the Defendant had never shaken the victim. She had not had any contact with the Defendant since he had been charged with the offenses in this case. She acknowledged that she suffered from bipolar disorder, and she said that her moods fluctuated "really quickly." She said she was treated with Zoloft and had been hospitalized three times for the illness.

Teddy Collingsworth, a criminal investigator with the district attorney general's office, testified that he specialized in child abuse investigations. He was contacted by Donna Spencer with DCS on April 25, 2007. He attended an interview with the Defendant and Ms. Trehern the next day. He interviewed Trehern first, reduced her statement to writing, and gave her an opportunity to review it. He made some corrections, read the statement to her, and allowed her to read it. He had her initial the mistakes. Ms. Trehern's statement specified:

> Investigator Teddy Collingsworth with the . . . District Attorney's office . . . told me that I wasn't under arrest and that I could get up and leave at any time. I give this statement freely and voluntarily.
>
> I have known [the Defendant] for approximately three years. We have two children together, [T.T.] 22 months and [the victim] four months. [The Defendant] and I were married 12-18-2004 and divorced 11-18-2006. We lived in Brewton, Alabama. [T.T.] was three years old and he had three broken ribs. [The Defendant] admitted that he hugged him and broke

-6-

the ribs after [T.T.] was crying and he picked him up to comfort him.

After moving to Rogersville, Tennessee, I let [the Defendant] come back to live with us, trying to work things out. I was working in Greeneville and [the Defendant] was baby-sitting. Then I got a job at Save-A-Lot in Rogersville [.] [The Defendant] was still watching the kids while I worked. On April the 9th, 2007, we took [the victim] to Dr. Giles office in Greeneville because she . . . wasn't eating well. Then during that week [the victim] was crying and [the Defendant] got upset and picked her up and shook her hard and I got her from him. [The Defendant] really loses his temper a lot when the children cr [y]. He calls [the victim] a b[----] when she cries a lot. Then on April 16, 2007 I had [the Defendant] to take the [the victim] back to Dr. Giles because all [the victim] was doing was sleeping and not eating. Dr. Giles did some tests and they came back normal. Then on Wednesday April 18, [the victim] had a seizure and I took her to W[el]lmont ER in Rogersville and she got out of the hospital on Thursday evening. Then on Saturday morning [the Defendant] came to work and got me, that [the victim] had another seizure and we took her back to the ER. And they transferred [the victim] to JCMC in Johnson City. When I caught [the Defendant] shaking [the victim] that day I had walked into the bedroom and it was when I came out that was when I saw him shaking her I don't know how long he had been shaking her. [The victim] had been crying a while before I come [sic] out of the bedroom. After the Doctor told me about the serious injuries that [the victim] had I knew in the back of my mind what caused the injuries. But, I was afraid to tell because I personally know what [the Defendant] can do when he gets mad. Sometimes [the victim] will be crying and when [the Defendant] goes to check on her she will cry a lot louder and I will ask [the Defendant] what did you do to her. He will say nothing.

Investigator Collingsworth testified that he and the DCS agent witnessed Ms. Trehern sign the statement. He next talked to the Defendant. The Defendant said he did not shake the victim but admitted that he got upset

when the victim cried. Collingsworth reduced the victim's statement to writing and the Defendant signed it. In it, the Defendant said:

> I moved back to my ex-wife, Michelle Trehern, the first of March 2007. I don't know the exact day. Michelle was working in Greeneville at T.I. Automotives; then Michelle got a job at Save-A-Lot in Rogersville. I was watching [T.T.], date of birth 6-6-05, and [the victim], date of birth 12-20-06, while Michelle was working.
>
> I took [the victim] to Dr. Giles in Greeneville about two weeks ago because Michelle was working. [The victim] was sleeping all of the time and not eating. Dr. Giles did some tests, but they came back normal. Then Michelle took [the victim] to the E.R. because [the victim] was having seizures last Wednesday. [The victim] was released the next day that evening. Then this past Saturday [the victim] had another seizure, and I went to Michelle's work and we took her to the E.R. in Rogersville and she was transferred to Johnson City Medical Center.
>
> When [the victim] cries it upsets me sometimes, but I have never shook [sic] her. I call [the victim] a bitch sometimes when she cries because I don't think nothing [sic] is wrong with her. Her mother calls her a bitch, too. I never get too upset that I don't remember what I do. When [T.T.] was four months old he would cry and I would get upset and it would upset me, and one time I picked him up and hugged him and broke five ribs. This was in Alabama. I do better since I went to anger management classes. I would never hurt [the victim]. I have never shook [the victim]. [T.T.] shakes [the victim] when she is in the bouncer seat and car seat. If I had done something to [the victim], I would admit it. If I did, I would tell her I'm sorry.

Investigator Collingsworth was contacted at 6:30 that evening. The Defendant had returned to the office and had asked to see him. The Defendant said he had not been truthful in his first statement. The Defendant gave a second statement to Collingsworth in which he stated:

I came to the Hawkins County Sheriff's Department and talked with Deputy Daniel Byington and told him I had talked to Investigator Teddy Collingsworth with the District Attorney's Office earlier today and hadn't told him everything, that I wanted to talk to [him]. At 7:15 Investigator Collingsworth told me that I wasn't under arrest and that I could get up and leave at any time. I give this statement freely and voluntarily.

Today when I talked with you I didn't tell you the truth. I caused the injuries to [the victim]. The week of April the 9th through the 16th I had [the victim] up over my head, playing with her and she was laughing. I got dizzy and lost sight and dropped [the victim], and before she hit the floor I got my sight back and she hit the floor on her back. I don't know if her butt or head hit the floor first. I didn't tell anybody or Michelle that I had dropped her. The doctors didn't ask me at the Johnson City Medical Center what happened to [the victim] to cause the injuries because I wasn't there much. This is the whole truth. I hugged my son, [T.T.], too tight, not knowing my strength, to cause the broken ribs. I lose vision when I sneeze and I sneezed the day I dropped [the victim].

On cross-examination, Investigator Collingsworth testified that he did not record the statements. At the time he interviewed Ms. Trehern, he had been told that the victim had a skull fracture and a rib fracture in addition to the subdural hematomas. He said that authorities in Alabama had conducted a nine-month investigation of the Defendant and the incident involving [T.T.] but that no charges were ever filed. He said that the Defendant was about six feet and two inches tall and that the ceilings of the trailer in which the Defendant lived were not high enough to allow the Defendant to stand and hold the victim overhead.

On redirect examination, Investigator Collingsworth demonstrated how Ms. Trehern described the Defendant's shaking the baby. He held his hands approximately eight or ten inches apart and moved them back and forth in front of his face.

Dr. Mary Ann Neal, a pediatric radiologist, testified that she reviewed multiple x-rays and scans of the victim. The victim had a left parietal skull fracture and subdural hematomas of different ages on each side of the brain.

On an initial skeletal survey, there was a question about a possible rib fracture, but subsequent x-rays were negative. Using the April 21, 2007 CT scan and an April 25, 2007 MRI, Dr. Neal described an acute area of bleeding on the left side of the brain and an older area of bleeding on the right side. The victim's brain had been pushed inward from the mass effect of the bleeding. She estimated the age of the left parietal hemorrhage as between one and ten days old as of April 21. She estimated the right parietal hemorrhage as older than ten days. She said the skull fracture occurred between ten days and three months before the CT scan. Dr. Neal said that based upon a reasonable degree of medical certainty, the subdural hematomas and skull fracture were consistent with neurological dysfunction. She said that absent a severe motor vehicle collision, the victim's injuries were consistent with non-accidental trauma.

On cross-examination, Dr. Neal testified that there might be other causes for a child to experience neurological problems. A fall from a significant height of six feet would cause cerebral hemorrhaging. Bruising was not always present in shaken baby syndrome. Lethargy, retinal hemorrhaging, and non-reactive pupils could also be symptoms of shaken baby syndrome. She said that bulging fontanels were not something that could be detected on the scans but that someone examining the victim would be able to feel them. The skull fracture could have occurred as a result of a fall from a height of six feet. She also said that the skull fracture occurred at the time of one of the hemorrhages. She did not agree that the injury to the right side of the skull dated to the time of the victim's birth, but she said that the injury could have occurred in January or February.

Dr. Jeff Carlsen testified that he was a pediatric ophthalmologist who examined the victim. He said he detected hemorrhages in three quadrants in the victim's left eye. Based upon a reasonable degree of medical certainty, his opinion was that the retinal hemorrhages were consistent with non-accidental trauma. He said the trauma in this case was [an] acceleration-deceleration injury, or shaken baby syndrome.

On cross-examination. Dr. Carlsen testified that bruising was not necessarily found in shaken baby syndrome. He said a major percentage of children who suffered shaken baby syndrome had major central nervous system injury. He said that the victim's eye injury was mild to moderate. He would not presume that hemorrhaging would occur in both of the victim's eyes because hemorrhaging in both eyes did not occur in twenty-five to thirty

percent of shaken baby cases. He also said that non-reactive pupils were not necessarily common in a shaken baby case and that in all the cases in which he had been involved, only one child had non-reactive pupils.

Dr. Ricky Mohon testified that he was the Director of the Pediatric Critical Care Unit at Johnson City Medical Center and an Associate Professor in the Department of Pediatrics at Quillen College of Medicine at East Tennessee State University. He first saw the victim on April 22, 2007, when she was transferred from another hospital. The victim's history was that she had been a normal three-month old baby until two weeks before he saw her. Nothing suggested the family was aware of anything that had caused the victim's injuries. The victim was hospitalized for about seventeen days. The victim had an EEG to detect seizures and was started on seizure medications. He said his diagnosis was a history of seizures and bilateral subdural effusions with the possibility of non-accidental trauma. He said he ruled out other causes of the bleeding. In his opinion, the bleeding injuries were caused by shaken baby syndrome and the skull fracture was caused by blunt force trauma, such as striking a wall or a floor. He said that the victim suffered serious bodily injury and that the subdural effusions could cause permanent brain damage and seizures. The victim had to have procedures to drain the blood from her head.

On cross-examination, Dr. Mohon testified that, ultimately, the victim had no rib fractures. He said that hairline fractures, chip fractures, and some of the findings in shaken baby syndrome are subtle changes that a radiologist might not have much experience in detecting. It would be unusual to have rib fractures in an infant because infants' chests are very flexible. Bruising did not necessarily indicate abuse or the severity of abuse, nor did the lack of bruising indicate no abuse. He did not notice any bruising on the victim. A retinal hemorrhage could cause permanent damage and blindness, and retinal hemorrhaging could occur during birth, during an automobile accident, or as the result of a fall. However, retinal hemorrhages caused by birth would resolve quickly and would not be present in a three-month-old baby. He had never seen a retinal hemorrhage in a child as the result of a fall from a parent's arms, but a fall from six to eight feet could cause cerebral hemorrhage. He said that non-reactive pupils resulted from significant injury but that reactive pupils did not negate a diagnosis of severe abuse. Lethargy was not necessarily a typical finding in shaken baby syndrome because a child's symptoms depended upon the severity of the injury and on the particular patient. It was possible for a shaken baby to be active and alert if the injury was not severe enough to affect mental status. He said that the victim probably

had a seizure disorder and that the subdural effusions and retinal hemorrhages were significant injuries. He was unable to say whether that trauma would cause permanent, irreparable brain damage. During the victim's hospitalization, she experienced vomiting, feeding problems, and aspiration problems, and Dr. Mohon attributed these complications to brain damage. He said the skull fracture indicated with a medical certainty that the victim had suffered a traumatic event. He said that without any history of trauma, the only diagnosis was non-accidental trauma. He said that after learning the extent of injuries, some parents would fabricate an event to explain how the injuries occurred but that the scenarios they fabricated would not be severe enough to explain the injuries. He agreed that dropping a baby from six feet onto a concrete slab could cause a skull fracture and retinal hemorrhaging. The patient history compiled by the resident physician, Dr. Stansberry, reflected that the victim had been watched by neighbors.

Donna Spencer testified for the defense that she was a child protective services investigator with DCS. She spoke with Michelle Trehern on April 25, 2007. Ms. Trehern asked whether DCS would give custody of the victim to the Defendant if she admitted that she committed the abuse. Ms. Spencer reported Trehern's statement to the district attorney general.

On cross-examination, Ms. Spencer testified that she was present when Ms. Trehern gave her statement to Investigator Collingsworth. She heard Trehern say every word that was contained in the statement. She saw Trehern sign the statement, and she signed it also. Her impression was that Trehern was trying to take the blame for the Defendant.

Investigator Collingsworth was recalled by the defense and testified that Ms. Trehern did not report that neighbors sometimes babysat the victim. He had reviewed the testimony from a juvenile court hearing in which she had testified that her neighbors watched her children. He said he did not see the doctor's report that reflected that neighbors had babysat the children until months after he interviewed Trehern. He agreed that he had not attempted to determine the names of the neighbors and what contact they might have had with the children. He said Trehern did not inform him that she suffered from bipolar disorder, that she was taking medication, or that she had been hospitalized three times for the disorder.

Betty Gorman, the victim's maternal grandmother, testified that she had physical and legal custody of the victim and the victim's older brother. The

-12-

victim had been "back and forth" to doctors for follow-up care and had begun experiencing seizure activity in July 2008. The victim's eyesight appeared to be fine, and the victim was developing normally for her age, except for a slight laxity in her speech.

*State v. Richard Trehern,* No.E2009-00066-CCA-R3-CD, 2010 WL 2695635, at *1-2 (Tenn. Crim. App. Nov. 12, 2010).

*Post-Conviction Hearing*

Petitioner testified that trial counsel did not hire an expert witness to contradict that the victim's injuries were caused by shaken baby syndrome. He said that trial counsel did not investigate his case or talk to any witnesses. He felt that trial counsel should have talked with his family members, including his mother and father, and individuals who babysat the victim. Petitioner could not recall the babysitters' names. He said that he gave trial counsel directions to their houses.

Petitioner testified that he was "locked up" for fourteen months, and trial counsel came to see him "maybe once or twice." He said that Lawrence Smith, the investigator for the public defender's office came to see him four or five times. Petitioner testified that trial counsel did not call him as a witness at trial. Petitioner further testified, "He told me - - he told me that during the trial it looked pretty good, you don't have to get up and testify, and about half way through he said everything looks good." Petitioner said that he wanted to testify at trial, and he would have told the jury the same thing that was in his statement.

On cross-examination, Petitioner acknowledged that his statement was admitted at trial. He further acknowledged that the trial court conducted a *Momon* hearing to determine whether he wanted to testify. Both trial counsel and the trial court questioned Petitioner during the *Momon* hearing, and Petitioner indicated that he understood his right to testify if he so desired. Petitioner further acknowledged during the hearing that he had decided that he was "comfortable with not testifying."

Concerning an expert witness, Petitioner admitted that several doctors testified at trial for the State, and they testified that "it was shaken baby." However, Petitioner felt that trial counsel should have sought a "shaken baby doctor. The only doctors that testified were not no [sic] expert on shaken baby syndrome." Petitioner acknowledged that the victim's medical records were admitted at trial, and the doctors testified from those records, which were records that they had made.

-13-

Petitioner testified that Mr. Smith introduced himself as an investigator for the public defender's office. He was not aware that Mr. Smith was previously a child abuse investigator with the district attorney general's office and had testified as an expert witness on child abuse numerous times in the past. Petitioner testified that Mr. Smith never reviewed any of the evidence with him. He said that Mr. Smith "just wanted me to tell him some of the things that I knew; you know what I'm saying."

Petitioner testified that trial counsel and Mr. Smith discussed a few defenses with him, one of which was that someone else committed the crime. They also suggested attacking the credibility of Petitioner's wife. Petitioner testified that he did not know that his sentence would have to be served at one-hundred percent rather than thirty percent. He acknowledged that trial counsel discussed a plea offer with him of fifteen years at one-hundred percent. However, Petitioner testified that at that time, trial counsel did not explain to him that the law required one-hundred percent service of his sentence. Petitioner admitted that trial counsel later discussed a second plea offer of twelve years at thirty-percent with him that he rejected. Petitioner did not know if trial counsel was working on an investigation to impeach his wife's credibility.

Lawrence Smith testified that he previously worked as an investigator with the public defender's office for eighteen years and retired in 2010. He also worked for the Hawkins County Sheriff's Department and the district attorney general's office. Mr. Smith testified that he met with Petitioner many times, and they discussed Petitioner's case. He also asked Petitioner to provide him with witnesses. Mr. Smith testified:

> We [were] not able to find a person that had been a neighbor that he had - - didn't know the name. The neighbor had relocated and was unable to contact that neighbor. Most of the people that [Petitioner] and I talked about were involved in the case, his ex-wife, Michelle, various social workers, psychologists, and things of that nature.

Mr. Smith testified that he did his best to find the unknown babysitter that Petitioner wanted him to interview; however, he did not have a name for the person.

Mr. Smith testified that during the course of his investigation, he obtained some records from Alabama with respect to Petitioner and his wife. There was a previous investigation in Alabama when Petitioner was investigated for child abuse. The charges were later dismissed. Concerning Petitioner's wife, Mr. Smith testified:

> In this case in Tennessee and a previous case in Alabama, Michelle had put the finger on [Petitioner], had told various different stories which I have

-14-

documentation from their case file, that [Petitioner] did things, and that they decided was not true, and Michelle has a long history of being untruthful, having mental problems, going and having outbursts, causing disturbances with police, have come - - She's filed false reports on [Petitioner], and I had discussed those situations with the Alabama case workers and also with the District Attorney, I believe his name, last [sic] name was Billy during that time.

Mr. Smith testified that it was his and trial counsel's plan to attack Ms. Trehern's credibility at trial. They were able to locate her a few days before trial and interview her. The interview was recorded. Mr. Smith testified that Ms. Trehern lied about Petitioner during the interview and changed her statement. He immediately notified trial counsel, and he and trial counsel then met with the District Attorney General. After the meeting, Petitioner received a more favorable plea offer. Trial counsel and Mr. Smith reviewed the offer with Petitioner, but he did not want to attack his wife's credibility and rejected the offer.

Mr. Smith testified that the State had numerous doctors listed as expert witnesses in the case. He recalled talking to some of the doctors, and he read every deposition from the doctors. Mr. Smith testified that there were numerous hearings and depositions in juvenile court involving Petitioner and his wife, and Mr. Smith "also interviewed all the attorneys, the guardian ad litems, and went over all of the medical evidence that the doctors had compiled and I'd have turned - - and I agreed that this child was a victim of shaken baby but they [sic] was no evidence in there saying who shook the baby."

Mr. Smith testified that he was familiar with some of the doctors who were going to testify in the case, and he was familiar with medical records of that type. He agreed with the doctors' findings. Concerning the records, Mr. Smith testified:

> We had also the x-rays, we had M.R.I.s, hospital lab reports, we had nurses' notes, we had a box of medical records and went through that, Mr. Mattocks and I did. Considered trying to attack the shaken baby syndrome, which had not been successful in the United States, but everything in the reports was clear; the evidence pointed that the injuries received by the child was from shaking.

Mr. Smith testified that he felt it would have been embarrassing and irritating to the jury for trial counsel to "drill" the doctors about whether the victim suffered from shaken baby syndrome. For that reason, he and trial counsel did not spend a lot of time "trying to sit down with each individual doctor."

Mr. Smith testified that the plan of defense was that Petitioner did not commit the crime. He said that he met with Petitioner at least ten times, and they received discovery. He noted that Petitioner had a mental evaluation and that he had a learning disability. Mr. Smith testified that Petitioner did not understand "when we would be talking about the medical issues about hematomas and about retinas bleeding and things."

On cross-examination, Mr. Lawrence testified that no expert was hired for Petitioner's case. He said:

> Dr. Cleveland Blake and Dr. Will McCormick and other doctors that I'm acquainted with, I often took the discovery medical reports, met with them, and did not hire them, but out of my experience becoming friends and acquainted with them would review records, give me opinions and things of that nature. The public defender's office was very limited on funds and so we [were] able to get ex - - advice from various people.

Mr. Smith said that the "primary" theory of defense was to impeach Ms. Trehern's credibility, but Petitioner did not agree to it.

Trial counsel testified that he had been an assistant public defender since 1992 and had worked on numerous cases, including child abuse cases. He was assigned to Petitioner's case and was assisted by Mr. Smith. Trial counsel testified that he asked Mr. Smith to try and locate a number of witnesses, which included a neighbor babysitter. However, they were never able to identify the babysitter. He also asked Mr. Smith to look into an Alabama investigation involving Petitioner.

Trial counsel testified that there seemed to be no effective method of challenging the doctors on whether the victim suffered from shaken baby syndrome. He said, "our theory of the case was that [Petitioner] had not done this, that it was Michelle Trehern who had caused these injuries." They also thought that it could have been the unnamed babysitter. However, with the minimal information about the babysitter, the defense was "going to target Michelle Trehern as the perpetrator."

Concerning attacking the credibility of Petitioner's wife, trial counsel testified:

And [Petitioner] was against us going after Michelle Trehern because I think he still harbored hopes that he was going to get out of jail and they were going to be back together again, one nice happy family, you know. And in that regard we were prepared to go ahead and attack her whether he wanted us to or not up to the point where we found out that she was changing her statement

-16-

and - - and I don't think what she changed it to was that she lied to police about that; I think she was saying the police made this stuff up that was in her statement and then made her sign it, threatened and coerced her into signing it. I think that's what she ended up testifying at trial by that point, you know, we were sort of in a dilemma, do we go ahead as we planned and go after her, you know, she's coming in and testifying and saying that none of this stuff in her statement ever happened, I want you to believe me, this is why the statement I signed is a lie. And if we had gone after calling her a liar at that point then it looked like what we were doing was throwing the jury back to her original statement and leaving them in a position where if she's lying now, then she must have been telling the truth then, and we did not want that.

Trial counsel testified that he knew of at least two occasions where he stopped and talked to Petitioner, prior to the indictment, while Petitioner was at the Hawkins County Jail, and prior to getting any information from the State. Trial counsel estimated that he and Mr. Smith met with Petitioner at least ten times, and they reviewed discovery with him. He also had individual meetings with Petitioner. Trial counsel testified that he had spent time with Petitioner "explaining and going over the statute itself, what he was charged with, and that it was going to be a hundred percent, that any sentence he was going to get was going to be served."

Trial counsel testified that Michelle Trehern was located the week before trial and was "reneging" on her story. He spoke with the District Attorney General who agreed to a plea offer of a reduced charge and twelve years at thirty percent. The offer was reviewed with Petitioner in the kitchen area of the jail, and Petitioner rejected it.

Trial counsel testified that he did not attack Ms. Trehern's credibility at trial because she testified that she never told Investigator Collingsworth that she saw Petitioner shaking the victim. Therefore, it was a "trial strategy." He had discussed the decision with the Public Defender and another defense attorney.

On cross-examination, trial counsel testified that he spoke with Dr. Maurice Robinson about the case. He did not attempt to retain him or Dr. Blake or Dr. McCormick because "[t]hey didn't have anything to say that was going to be beneficial to the defense."

## II. Standard of Review

On appeal, Petitioner asserts that he received ineffective assistance of trial counsel because trial counsel (1) failed to adequately communicate and meet with him to prepare for the case; (2) failed to attack the credibility of Petitioner's wife on cross-examination; (3)

failed to advise him that the crime for which he was charged had no release eligibility date; (4) failed to adequately advise him of the consequences of *Momon*; and (5) failed to obtain an expert witness to rebut the State's theory of shaken baby syndrome. We disagree.

In a claim for post-conviction relief, the petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. Petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn.Code Ann. § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). The post-conviction court's factual findings "are conclusive on appeal unless the evidence preponderates against those findings." *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Upon review, this court will not reweigh or reevaluate the evidence below, and all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court, not this court. *Momon v. State*, 18 S.W.3d 152,156 (Tenn. 1999).

On appeal, the post-conviction court's findings of fact are entitled to substantial deference and are given the weight of a jury verdict. They are conclusive unless the evidence preponderates against them. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). A post-conviction court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). Our supreme court has "determined that the issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact, . . . thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief based on the alleged ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient, and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Concerning Petitioner's post-conviction petition, the trial court made the following findings:

> The Court finds that Petitioner is not credible concerning his allegations that his attorney, [ ], did not investigate the case, only visited him one or two times and would not let him testify at trial. The proof in this matter shows that [trial counsel] is an experienced public defender who investigated the case with the help of a very experienced investigator, Lawrence Smith. Mr. Smith attempted to locate witnesses including the babysitter that Petitioner could not name. Mr. Smith and [trial counsel] both agreed that the child's injuries were consistent with shaken baby syndrome and that there was no need to try to locate an expert to attack the child's injuries. [Trial counsel] and Mr. Smith agreed that the real issue in the case was: who caused the injuries? They wanted to attack the credibility of Petitioner's ex-wife, Michelle Trehern but Petitioner would not let them. [Trial counsel] and Mr. Smith visited Petitioner on many occasions and [trial counsel] testified he went over discovery with Petitioner. [Trial counsel] had a very difficult case because Petitioner said that he lied in the first statement to law enforcement and that he dropped the baby when he sneezed and blacked out. Petitioner's second statement was less credible when doctors testified the child had different ages of injuries and the injuries could not be caused by dropping the baby.

*Failure to Sufficiently Meet with Petitioner*

Petitioner contends that trial counsel failed to adequately meet with him before trial to prepare for the case and work toward an effective defense. Petitioner asserts that he was incarcerated for fourteen months prior to trial and that trial counsel only met with him once or twice during that time, and he met with the investigator four or five times. However, the trial court credited the testimony of trial counsel and Lawrence Smith. Mr. Smith testified that he met with Petitioner more than ten times, and they discussed Petitioner's case and reviewed discovery. They also discussed witnesses, including a babysitter whose name

Petitioner could not provide. The plan of defense was that Petitioner did not commit the crime and that it was committed by Petitioner's ex-wife, Michelle Trehern.

Trial counsel testified that he knew of at least two occasions that he visited Petitioner in jail prior to the indictment. Trial counsel further estimated that he and Mr. Smith met with Petitioner at least ten times, and they reviewed discovery with him. He also had individual meetings with Petitioner.

Petitioner has not demonstrated that trial counsel's performance in this area was deficient or how further meetings or communication with trial counsel would have helped his case. Petitioner is not entitled to relief on this issue.

*Failure to Attack the Credibility of Petitioner's Ex-wife*

Next, Petitioner argues that trial counsel rendered deficient performance by not attacking the credibility of his ex-wife, Michelle Trehern, at trial. Ms. Trehern gave a statement to police implicating Petitioner as the perpetrator of the crimes. However, immediately before trial, when interviewed by trial counsel and Mr. Smith, Ms. Trehern informed them that her story had changed. At trial, she testified that the police made up the contents of her statement and then threatened and coerced her into signing it. Her testimony at trial was then more favorable to Petitioner. Trial counsel testified:

> And if we had gone after calling her a liar at that point then it looked like what we were doing was throwing the jury back to her original statement and leaving them in a position where if she's lying now, then she must have been telling the truth then, and we did not want that.

Trial counsel further testified that he made a tactical decision not to attack Ms. Trehern's credibility. We further note that both trial counsel and Mr. Smith testified that in any event, Petitioner did not want his ex-wife's credibility attacked at trial.

We conclude that trial counsel made a sound, strategic decision not to attack Ms. Trehern's credibility. As noted above, this Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). Moreover, Petitioner has not demonstrated or even argued how his case was prejudiced by trial counsel's performance in this area.

*Failure to Advise Petitioner of Release Eligibility*

Third, without any further argument, Petitioner contends that trial counsel was ineffective for failing to advise him that the charge of aggravated child abuse "had no release eligibility date and also stated that his counsel did not go over that fact with him." However, trial counsel testified that he had spent time with Petitioner "explaining and going over the statute itself, what he was charged with, and that it was going to be a hundred percent, that any sentence he was going to get was going to be served." Petitioner has failed to prove his claim by clear and convincing evidence, and he is not entitled to relief on this issue.

*Failure to Adequately Explain the Consequences of Momon*

Fourth, Petitioner argues that he did not understand the consequences of the *Momon* hearing and "misconstrued his counsel's advice." He further contends that "counsel had a duty to make him affirmatively understand the consequences of his Momon examination, particularly since his own counsel testified that he 'needed a lot of help' as far as going over the more technical aspects of his case." The record shows that the trial court conducted a *Momon* hearing to determine whether Petitioner wanted to testify. *See Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999). Both trial counsel and the trial court questioned Petitioner during that hearing, and Petitioner indicated that he understood his right to testify if so desired. Petitioner acknowledged at the *Momon* hearing that he was "comfortable with not testifying." Petitioner has not demonstrated that trial counsel's performance was deficient in this area.

Furthermore, Petitioner cannot demonstrate prejudice. He testified that the post-conviction hearing that if he had testified at trial, he would have told the jury the same thing that was in his statement to police which was admitted at trial. Petitioner is not entitled to relief on this issue.

*Failure to Hire an Expert Witness*

Finally, Petitioner contends that trial counsel was ineffective for failing to hire an expert witness to rebut the State's theory that the victim suffered from shaken baby syndrome. We disagree.

Lawrence Smith recalled talking to some of the doctors who were listed as witnesses for the State, and he read every deposition from the doctors. He reviewed all of the medical evidence that the doctors had compiled, and he agreed that the victim suffered from shaken baby syndrome. The only issue was a question of who actually shook the victim.

Concerning the victim's medical records, Mr. Smith testified:

We had also the x-rays, we had M.R.I.s, hospital lab reports, we had nurses' notes, we had a box of medical records and went through that, [trial counsel] and I did. Considered trying to attack the shaken baby syndrome, which had not been successful in the United States, but everything in the reports was clear; the evidence pointed that the injuries received by the child was from shaking.

Mr. Smith testified that he felt it would have been embarrassing and irritating to the jury for trial counsel to "drill" the doctors about whether the victim suffered from shaken baby syndrome. For that reason, he and trial counsel did not spend a lot of time "trying to sit down with each individual doctor." Mr. Smith testified he often took "the discovery medical reports" to Dr. Cleveland Blake and Dr. Will McCormick and other doctors that he was acquainted with to review and give him opinions and "things of that nature." He explained that the public defender's office was very limited on funds and was able to get advice from various people. Trial counsel testified that he spoke with Dr. Maurice Robinson about the case. He did not attempt to retain him or Dr. Blake or Dr. McCormick because "[t]hey didn't have anything to say that was going to be beneficial to the defense." We conclude that Petitioner has not shown that trial counsel's performance in this area was deficient.

We further conclude that Petitioner cannot show prejudice because he did not present any expert proof at the post-conviction hearing. *See Corwyn E. Winfield v. State*, No. W2003-00889-CCA-R3-PC, 2003 WL 22922272, at *9 (Tenn. Crim. App. Dec. 10, 2003) (petitioner failed to prove prejudice on the claim of ineffective assistance of counsel for failing to secure an expert because petitioner "did not present any expert proof on the issue at the post-conviction hearing."). Petitioner is not entitled to relief on this issue.

We conclude that Petitioner has failed to show by clear and convincing evidence that he received ineffective assistance of counsel at trial or that he was prejudiced by any alleged defective representation by counsel. Petitioner is not entitled to relief in this appeal. Accordingly, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE